| UNITED STATES DISTRICT COURT | NOT FOR PUBLICATION |
| EASTERN DISTRICT OF NEW YORK | |

XIN WEI LIU,
       Plaintiff,

– against –      **MEMORANDUM & ORDER**

MATSUYA QUALITY JAPANESE INC.,
d/b/a Matsuya Quality Japanese Eats, MATSUYA   16-cv-3624 (ERK) (VMS)
OF GREAT NECK, INC., d/b/a Matsuya,
BERNARD BENLEVI

       Defendants.

Korman, *J*.:

  Plaintiff Xin Wei Liu formerly worked at a restaurant and caterer known as Matsuya. He brings this action against Matsuya's sole owner and manager, Defendant Bernard Benlevi, and the corporate entities behind the establishment, Defendants Matsuya Quality Japanese Inc. and Matsuya of Great Neck, Inc.,[1] claiming that they failed to pay him overtime compensation in violation of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). Liu also alleges other violations of the NYLL, including failure to pay "spread of hours" and to provide certain notices and statements. The defendants have counterclaimed, alleging that Liu is liable under New York's "faithless employee doctrine," and they have now moved for summary judgment, seeking the dismissal of all Liu's claims, and a finding of liability on their counterclaim. Liu has not cross moved for summary judgment.

**Background**

  In June 2013, Benlevi hired Liu as a sushi chef. Pl.'s Counter Rule 56.1 Statement ("Counter 56.1") ¶ 4. At Liu's job interview, they orally agreed to certain terms of employment,

---
[1] The parties dispute which corporate entities managed the restaurant and when the restaurant began its catering business. *See* Pl.'s Counter Rule 56.1 Statement ¶¶ 1–2. For the purposes of this motion, that dispute is irrelevant.

1

*see* Liu Decl. ¶ 6; Benlevi Dep. 61:18–20, but each side characterizes the agreement differently. According to Benlevi, Liu was offered a minimum guarantee of $750 per week, with a base rate of $10 per hour and $15 for overtime. Benlevi Dep. 57:8–13. He also offered Liu an additional $50 bonus for each party he worked. *Id.* But according to Liu, the agreement was slightly different: he testified that he was simply offered $750 for 40 hours of weekly work, with no explicit base hourly rate. Liu Dep. 30:8–23; 152:6–153:21.

Liu worked at Matsuya from June 2013 until he quit in September 2015. Counter 56.1 ¶¶ 4, 34. Over the course of his employment, both his compensation arrangement and his hours changed. With respect to compensation, Liu testified that in January 2014 he began receiving $800 per week for 40 to 55 hours of work. Liu Dep. 220:9–222:12. But as Benlevi construes it, only Liu's "minimum guarantee" increased to $800; his hourly rate remained the same. Benlevi Dep. 76:17–77:9. Benlevi also testified that he eventually started paying Liu a $100 "automobile compensation," as well as an additional $5 per hour for work before 8 a.m. and a "double time hourly rate" for weekly hours above 60. *Id.* at 58:2–59:23.

With respect to hours, Liu admits that from June through October 2013 he "generally worked around 40 hours a week and only occasionally worked overtime." Liu Decl. ¶ 9. But he states that from November 2013 through February 2015 he "worked mostly from about 56 hours to sometimes up to about 70 something hours per week." *Id.* at ¶ 13. He also declares that from March to June 2015 he generally worked about 65 to 75 hours per week, and, from July until September 2015, around 55 hours per week. *Id.* at ¶¶ 14–15. The defendants, however, observe that Liu's various declarations throughout this litigation have not been entirely consistent with respect to his total hours worked. *See* Defs.' Reply in Supp. of Summ. J. ("Defs.' Reply"), Ex. K.

The parties have produced two sets of evidence that bear directly on Liu's total hours and compensation: the "notebook" and the "compensation schedules." Because of their centrality to this motion, each bears some discussion.

*The notebook.*

Initially, Liu would record his hours on his cellphone, and he would then send those hours to Benlevi. Liu Dep. 101:5–7. Eventually, presumably, Benlevi decided that better recordkeeping was needed. At some point, he told Long Lin Li ("Linda")—the head waitress who assists Benlevi in managing the restaurant's employees—to buy a notebook. Counter 56.1 ¶¶ 1, 10–11. At the end of each week (or soon after), Linda and Liu would sit down, and Liu would tell her the start and end times for each day he had worked that week. Liu Decl. ¶ 20. Linda would record those times in the notebook and then calculate the total hours worked each day, the total hours for the week, and the total compensation. *Id.*; *see also* Liu Dep. 194:6–195:11. A photo of the notebook page would be sent to Benlevi, and Liu would ultimately sign the relevant page after he was paid. Liu Decl. ¶ 20.

The notebook reveals Liu's total weekly hours and compensation for most weeks from April 14, 2014, through September 13, 2015. *See* Defs.' Mot. for Summ. J., Ex. G. It shows that, during that period, Liu nearly always worked more than 40 hours a week. Based on my own calculations, he averaged roughly 59. Moreover, it apparently reveals the following compensation arrangement: Liu would nearly always receive at least $800 per week. If Liu worked more than 55 hours, he would be paid an additional $15 per hour for hours 55 through 60, and then another $20 per hour for every hour above 60. Additionally, Liu would receive a $50 bonus for each party he worked, as well as additional compensation for any hours worked before 8 a.m. For example, during the week beginning July 7, 2014, Liu worked a total of 67.50

hours, including one party. He therefore received his regular $800; another $75 for hours 55 through 60 (*i.e.* 5 × 15); another $150 for hours 60 through 67.5 (*i.e.* 7.5 × 20); and a $50 party bonus, for a total of $1075. Liu has also produced a sheet, seemingly from the notebook, that explicitly outlines this arrangement. *See* Pl.'s Opp. to Summ. J., Ex. G.

*The compensation schedules.*

According to the defendants, Benlevi would give Liu a "weekly compensation schedule . . . shortly after making each payment." Defs.' Mem. in Supp. of Summ. J. ("Defs.' Mem.") 5; *see also* Benlevi Dep. 94:2–12. The defendants produced those schedules during discovery. *See* Pl.'s Opp. to Summ. J., Ex. H. Liu, however, claims that that was the first time he had ever seen such documents. Counter 56.1 ¶ 28.

Benlevi testified that he would prepare the compensation schedules based on the notebook entries. Benlevi Dep. 79:2–7. It's important to note, however, that the accounting in the weekly compensation schedules differs from the reporting in the notebook. Consider, for instance, the week of April 21 through April 27, 2014. The notebook entry for that week provides that Liu worked 11 hours on Monday, 0 on Tuesday, 16 on Wednesday, 16.5 on Thursday, 12 on Friday, 12 on Saturday, and 0 on Sunday, for a total of 67.5 hours. The notebook then notes "+2 party," and adds another $20 for work done before 8 a.m. The notebook entry for the week then concludes with the following equation: "75+150+20+100+800=1145.00." That seems to mean that Liu was entitled to $800 for his first 55 hours worked, $75 for hours 55 through 60 (based on a rate of $15/hour), $150 for hours 60 and up (based on a rate of $20/hour), $20 for hours worked before 8 a.m., and $100 for the two parties worked ($50 for each).

The compensation schedule, however, calculates the hours differently. For each of the five days Liu worked that week, the schedule adds a "spread hour," bringing the total hours

4

worked to 72.50 (in contrast to the notebook's total of 67.50). Then, unlike the notebook, the schedule breaks down those 72.50 hours into the following three categories: (1) "Rate 1-40," for which Liu receives $10 per hour; (2) "Rate 40+," for which he receives $15 per hour; and (3) "Early AM," for which he receives $20 per hour. For the first category, unsurprisingly, the schedule reports 40 hours, for a total of $400 ($10 \times 40$). For the second, however, the schedule reports not 32.50 (the total number of 40+ hours including the spread hours) and not 27.50 (not including the spread hours), but rather 28.5 hours, for a total of $427.50 ($15 \times 28.5$). And for the third, the schedule reports 4 hours, for a total of $80 (again, unlike the notebook), for a sum total of $907.50 for all the hours. The schedule then adds in a $100 "auto bonus," (which is not in the notebook), a $100 party bonus, and then another $37.50 labeled as "other/grat" (also not in the notebook), resulting in a total payment of $1,145. That's the same bottom line as in the notebook, but, as should be evident, the accounting method differs substantially and suggests a different compensation arrangement from the one apparent in the notebook.[2]

*Liu's DOL complaint.*

After quitting on September 20, 2015, Liu filed a complaint against Benlevi with the New York State Department of Labor (DOL), alleging failure to pay overtime, along with other violations of state labor laws. *See* Pl.'s Opp. to Summ. J., Ex. I. After investigating Matsuya, the DOL found a "minimum wage/overtime underpayment" with respect to both Liu and another employee. *Id.* Moreover, it concluded that Benlevi had failed to keep adequate records, in violation of New York Labor Law Section 661, and that he had failed to furnish pay statements to employees, in violation of Part 146-2.3 of the Hospitality Industry Wage Order. *Id.* The DOL

---

[2] Indeed, the compensation schedules (unlike the notebook) also include a category labeled "min guarantee bns." For a number of weeks, that category contains the difference between 800 (or 750) and the total amount Liu would have otherwise received.

determined that Benlevi owed Liu $9,380.25 in unpaid wages, plus $2,345.06 in "liquidated damages." *Id.* (It also found that he owed the other employee a total of $53,047.50. *Id.*)

*The present action.*

In June 2016, Liu initiated the present action—stylized as a collective and class action—alleging: (1) that the defendants violated the FLSA's overtime pay requirements, Compl. ¶¶ 51–59; (2) that the defendants violated the NYLL's overtime and spread of hours requirements, *id.* at ¶¶ 60–64; (3) that the defendants failed to provide notices and statements as required by NYLL § 195(1), *id.* at ¶¶ 65–70; and (4) that the defendants failed to provide detailed pay stubs as required by NYLL § 195(3), *id.* at ¶¶ 71–74. Liu later amended his complaint, dropping the class and collective action claims, but also adding as a defendant Matsuya of Great Neck, Inc.—another corporate entity that also allegedly owned and operated the restaurant. First Am. Compl. ¶¶ 11–15.

In response, the defendants counterclaimed that Liu was liable under New York's "faithless employee doctrine," which obligates employees to "exercise the utmost good faith and loyalty in the performance of [their] duties.'" *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (per curiam) (quoting *W. Elec. Co. v. Brenner,* 41 N.Y.2d 291, 295 (1977)). The defendants claimed that Liu violated this duty by (1) willfully misrepresenting his hours and then demanding and receiving compensation for hours he never worked; (2) seizing two of the restaurant's journals in which his working hours and other information were recorded; and (3) "[f]iling false and misleading claims" with the DOL. Am. Answer ¶¶ 9–11.

After engaging in discovery, the defendants have now moved for summary judgment on all four causes of action, and on their counterclaim as to liability only. Defs.' Mem. 1.

**Discussion**

I. *The summary judgment standard.*

Summary judgment is required when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), but a "genuine" dispute does exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must 'examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Frito Lay, Inc. v. LTV Steel Co.*, 10 F.3d 944, 957 (2d Cir. 1993)). A district court's task at summary judgment "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).

II. *Liu's FLSA and NYLL overtime claims.*

  A. <u>A reasonable jury could find that Liu was not paid overtime wages.</u>

Liu alleges that, between November 2013 and September 2015, he worked more than 40 hours a week and that the defendants failed to pay him overtime for those hours per the FLSA and the NYLL. First Am. Compl. ¶¶ 32–33, 39.

The FLSA requires employers to pay covered employees "at a rate not less than one and one-half times [their] regular rate" for hours worked in excess of 40 per week. 29 U.S.C.

7

§ 207(a)(1). The NYLL requires the same and adopts the FLSA's methods for calculating overtime wages. *See* N.Y. Comp. Codes R. & Regs. tit. 1212 § 142-2.2 (2018); *see also Jemine v. Dennis*, 901 F. Supp. 2d 365, 375 (E.D.N.Y. 2012). Generally, an employee's "regular rate" is his or her hourly rate. 29 C.F.R. § 778.109. When an employee is paid a weekly salary, the regular rate is calculated "by dividing the salary by the number of hours which the salary is intended to compensate." 29 C.F.R. § 778.113(a).

Here, Liu has furnished evidence—namely, the notebook—demonstrating that, between mid-April 2014 and September 2015, he nearly always worked more than 40 hours a week. The defendants' own compensation statements corroborate this; in fact, they further show that Liu worked more than 40 hours every week between November 2013 and mid-April 2014—the period not covered by the notebook. *See* Pl.'s Opp. to Summ. J., Ex. H.

The question, then, is whether Liu was properly compensated for those overtime hours in accordance with the FLSA and NYLL. That, in turn, depends on Liu's "regular rate." On the one hand, the compensation statements explicitly state—in line with Benlevi's testimony—that Liu was paid $10/hour for his first 40 hours of work, and then at least $15/hour for all hours worked beyond 40. If that was the case, then no FLSA or NYLL violation occurred. *See Adams v. Dep't of Juvenile Justice of City of New York*, 143 F.3d 61, 67 (2d. Cir 1998). But on the other hand, the notebook demonstrates that, at least with respect to the period between mid-April 2014 and September 2015, Benlevi simply intended to pay Liu a base salary of $800 a week for 55 hours of work—in line with Liu's sworn statements. Indeed, Liu has even produced a sheet, seemingly from the notebook, that explicitly states: "[Liu] works 55 hours per week[;] $800 base pay." With this evidence, a reasonably jury could conclude that Liu's "regular rate" between mid-April 2014 and September 2015 was not $10 but rather $14.55 (800 ÷ 55). *See* 29 C.F.R. § 778.113(a). And

if so, Liu would be entitled to 1.5 times that amount—$21.82—for all hours he worked in excess of 40 per week. Specifically, if, as described in the notebook, Liu was paid $800 for his first 55 hours, $15/hour for hours 55 through 60, and $20/hour for hours above 60, he would then be entitled to an additional $7.27 (21.82 – 14.55) for each hour between 40–55, an additional $6.82 (21.82 – 15) for each hour between 55–60, and an additional $1.82 (21.82 – 20) for each hour above 60. *See id.* A dispute of material fact therefore exists here; summary judgment is inappropriate.

The defendants nonetheless aver that overtime premiums were built into Liu's weekly salary. Citing Benlevi's deposition testimony, they insist that Liu agreed to a base rate of $10/hour and $15/hour for "estimated overtime." Defs.' Mem. 4. They also point to their compensation schedules, which demonstrate an hourly rate of $10 for hours 1 to 40 and $15/hour for hours 40+. *See id.* at 12. They even assert that Liu "has admitted to an overtime hourly rate of $15." *Id.* at 16.

But as many courts have explained, "[u]nless the contracting parties intend and understand the weekly salary to include overtime hours at the premium rate, courts do not deem weekly salaries to include the overtime premium for workers regularly logging overtime." *Giles v. City of New York*, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999) (collecting cases); *see also Berrios v. Nicholas Zito Racing Stable, Inc.*, 849 F. Supp. 2d 372, 385 (E.D.N.Y. 2012). Here, Liu testified that he was paid by the week and never discussed an hourly rate with Benlevi. In fact, there is no mention of a $10 hourly rate in the notebook. And while the defendants claim that Liu admitted that his overtime hourly rate was $15, I cannot find any support in the record for this assertion. The defendants cite page 57 of Liu's deposition transcript, yet that page contains no admission, or even any discussion, of Liu's overtime rate. Liu did acknowledge that he was paid

a rate of $15 an hour for overtime in excess of 55 hours but below 60 hours, *see* Liu Dep. 197:8–198:3, but that is not the same as admitting a general overtime rate of $15, and it is not an admission that his hourly base rate was $10. On this record, a reasonable jury could find that Liu did not intend and understand that his weekly salary would include overtime premiums. And if so, Liu's compensation arrangement violated the FLSA and NYLL. Summary judgment for the defendants is therefore unwarranted.

B. The inclusion of break times in Liu's total hours does not compel summary judgment.

The defendants argue that Liu included his break times in the total hours he reported. Defs.' Mem. 13. They claim that these breaks included a daily one-hour unpaid meal break, along with three one-hour trips to the gym per week, "amount[ing] to at least 9 hours per week." *Id.* They assert that the notebook did not reflect these break times and thus overstated the total hours Liu worked. *Id.* Assuming "9 hours of nonworking time" for which Liu was improperly compensated, they argue that "the alleged failure to pay overtime compensation amounts to a mathematical impossibility given the plaintiff's meal time, breaks and rest periods." *Id.* at 14–15.

This argument fails. First, a reasonable juror could conclude that Liu took off less than 9 hours per week. While Liu admitted at his deposition that "there was a one-hour meal time per day," Liu Dep. 188:23–25, it's not clear that he actually took that break every day. Liu testified, in fact, that if he worked "four and a half hours on Thursday, five and a half hours on Sunday," he would not take a lunch break. *Id.* at 211:11–17. Moreover, he testified that he normally did not take lunch breaks on Fridays and Saturdays, at least during the period between June and October 2013. *Id.* at 57:3–59:4. Given Liu's catering responsibilities, irregular hours are unsurprising, and indeed, Linda, in her own deposition testimony, confirmed that Liu would not take lunch breaks every day. Li Dep. 36:14–17. And while Liu admits to going to the gym during work, he testified

10

that he did so during the one-hour lunch break and typically just twice a week. Liu Dep. 34:8–12; 35:4–5. On the evidence presented here, the number of "break hours" Liu took during the average week is far from settled.

Second, and perhaps most important, a reasonable juror could conclude that the defendants agreed to compensate Liu for his break hours and treat them as hours worked. As a general matter, "bona fide meal periods," during which "[t]he employee must be completely relieved from duty for the purposes of eating regular meals," are not considered work time for the purposes of the FLSA. 29 C.F.R. § 785.19(a). An employer, though, can choose to compensate employees for break hours that would otherwise be non-compensable. To be sure, "[t]he agreement of the parties to provide compensation for such hours may or may not convert them into hours worked, depending on whether or not it appears from all the pertinent facts that the parties have agreed to treat such time as hours worked." 29 C.F.R. § 778.320. In other words, just because an employer provides an employee with a paid lunch hour does not *necessarily* mean that hour is added to the employee's total weekly working hours for the purposes of the FLSA's overtime requirements. But the question remains "whether or not it appears from all the pertinent facts that the parties have agreed to treat such time as hours worked." *Id.* "Determination of whether such an agreement exists 'involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, . . . and all of the surrounding circumstances.'" *Scott v. City of New York*, 592 F. Supp. 2d 386, 401 (S.D.N.Y. 2008) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944)). And generally, "the agreement of the parties will be respected, if reasonable." 29 C.F.R. § 778.320.

A reasonable juror could find that Benlevi agreed both to compensate Liu for his break hours and to treat them as hours worked for the purposes of calculating overtime. As Liu recounts it, he submitted his weekly hours by telling Linda his start and end time for each day of the week. Based on those times, *Linda*, not Liu, would calculate Liu's total daily—and then weekly—hours. Linda could have deducted break hours from these totals; she knew that Liu took them. *See* Li Dep. 35:6–37:2. Yet she didn't. And Benlevi, when reviewing those notebook entries, did not object, even though he knew that the restaurant closed for an hour each afternoon and that "the staff would take a one hour unpaid break" during that time. Benlevi Dep. 38:21–25. Indeed, he even testified that he generally would account for those breaks, *id*. at 39:4–7, and he didn't do so for Liu. On these facts, a reasonable jury could conclude that Benlevi agreed to compensate Liu for his breaks.

And a reasonable jury could also find that Benlevi agreed to treat those breaks as hours worked for the purposes of calculating overtime. Recall that, as demonstrated by the notebook, Benlevi paid Liu overtime rates for hours worked above 55 a week. That rate may not have been sufficient under the FLSA, as discussed above. But Benlevi still had an overtime payment scheme for Liu. And in applying that scheme, Benlevi counted all the reported hours, even though he clearly knew some were spent on a break. When these facts are construed in the light most favorable to Liu, a reasonable jury could find that Benlevi agreed to count Liu's breaks as hours worked for the purposes of determining overtime. Accordingly, that Liu's total hours included breaks does not entitle the defendants to summary judgment here.

C. The defendants' fluctuating workweek defense is unavailing.

In their reply brief, the defendants contend that Liu's compensation arrangement complied with the "fluctuating workweek" method described in 29 C.F.R. § 778.114. *See* Defs.'

Reply 5–8. Because the defendants raise this argument for the first time in a reply brief, I do not consider it. *Torres v. DeMatteo Salvage Co.*, 34 F. Supp. 3d 286, 287 (E.D.N.Y. 2014). But even if I were to, the fluctuating workweek method would not compel summary judgment here.

The fluctuating workweek method is an alternative way of calculating an employee's "regular rate." It applies when an employee has a "mutual understanding with his employer that he will receive a fixed amount as straight-time pay for whatever hours he is called upon to work in a workweek, whether few or many." *Ayers v. SGS Control Servs., Inc.*, 03–cv–9078, 2007 WL 646326, at *8 (S.D.N.Y. Feb. 27, 2007) (quoting *Condo v. Sysco Corp.*, 1 F.3d 599, 601 (7th Cir. 1993)). In such a situation, "the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week." 29 C.F.R. § 778.114(a). Judge Easterbrook offers a useful example:

> Consider an employee paid $400 per week for however many hours worked. That employee may work 30 hours one week and 50 hours the next. The salary is not diminished even if the number of hours falls below 40, nor is the employee expected to make them up in the future. The possibility of a higher hourly rate in one week justifies a reduction in overtime compensation if, in future weeks, hours rise above 40. Numerically it works like this. In the 30–hour week, the $400 salary produces a straight-time compensation of $13.33 per hour ($400/30), all of which the employee keeps. In the 50–hour week, the straight-time rate is $8 per hour ($400/50); 10 of these 50 hours are overtime, but because the base rate includes $8 for each of these hours, the incremental pay for overtime is only $4 per hour more, and the total wages for the week are $440. This *includes* time and a half for the 10 overtime hours, giving the employer credit for the $8 base rate spread over 50 hours.

*Heder v. City of Two Rivers, Wisconsin*, 295 F.3d 777, 779–80 (7th Cir. 2002).

Significantly, to qualify for the fluctuating workweek method, "it is not enough that the [employee] receive a fixed *minimum* sum each week." *O'Brien v. Town of Agawam*, 350 F.3d 279, 288 (1st Cir. 2003). The employee must receive a "fixed amount" for all hours worked during the week, "whether few or many." 29 C.F.R. § 778.114(a). Accordingly, several courts

have "held that paying an employee hours-based, or time-based, bonuses and premiums—such as extra pay for holiday, weekend, or night work—offend[s] § 778.114's requirement of a 'fixed weekly salary.'" *Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 255–56 (S.D.N.Y. 2013) (citing cases). Here, Liu did not receive a fixed amount each week; rather, as both the notebook and the compensation schedules demonstrate, his salary varied depending on how many hours he worked because he received time-based premiums. Consequently, the fluctuating workweek method does not apply.

Indeed, the defendants' fluctuating workweek argument is confusing given that it contradicts their version of the facts. In arguing for summary judgment, the defendants have maintained that Liu's compensation consisted of a base rate of $10/hour, with an overtime rate of $15/hour. *See, e.g.*, Defs.' Mem. 4. And based on those rates, they argue that Liu has received proper overtime pay. But applying the fluctuating workweek method, Liu's regular rate would not be $10/hour; instead, it would vary by week, depending on the actual hours worked. The defendants cannot have their cake and eat it too.

In sum, the defendants' last-ditch fluctuating workweek argument is unavailing. Summary judgment is inappropriate on the plaintiff's FLSA and NYLL overtime claims.

III. *Liu's NYLL spread of hours claim.*

In addition to claiming unpaid overtime under the FLSA and the NYLL, Liu also alleges that the defendants owe him "spread of hours" pay under the NYLL. *See* First. Am. Compl. ¶¶ 54–56. "The spread of hours is the length of the interval between the beginning and end of an employee's workday," which "includes working time plus time off for meals plus intervals off duty." *See* N.Y. Comp. Codes R. & Regs. tit. 1212 § 146-1.6 (2018). For "each day on which the

spread of hours exceeds 10, an employee shall receive one additional hour of pay at the basic minimum hourly rate." *Id.*

Liu alleges that the defendants failed to make such payments. The defendants, in seeking summary judgment on this claim, point to their compensation schedules, which provide that "spread hrs" were added for each day Liu worked more than 10 hours. But the problem is that the notebook suggests that Liu did not receive any spread-of-hours pay. Given these contradictory documents, summary judgment is inappropriate.

IV. *Liu's NYLL wage-notice claims.*

Finally, Liu alleges that the defendants failed to provide him with certain notices required by NYLL § 195(1) and (3).

A. NYLL § 195(1).

N.Y. Lab. Law § 195(1)(a) requires employers to provide employees, at the time of their hiring, with a written notice containing various information. The law further mandates that employers "obtain from the employee a signed and dated written acknowledgement, in English and in the primary language of the employee, of receipt of this notice, which the employer shall preserve and maintain for six years." N.Y. Lab. Law § 195(1)(a). The defendants seek summary judgment on this claim but appear not to offer any argument for why they are entitled to it. In fact, not only has Liu declared that Benlevi never provided him with the required notice when he was hired, Liu Decl. ¶ 7, Benlevi himself has admitted that "[t]here was no agreement reflecting the terms of [Liu's] employment." Benlevi Dep. 61:18–20. And while Benlevi testified that "[a]t some point" after hiring Liu he asked him to sign "a document that was crafted for the sole purpose of protecting himself from [Liu] perhaps trying to woo business away from his clients,"

15

*id.* at 60:5–12, Benlevi did not believe he asked Liu to sign any other documents, *id.* at 61:15–17. The defendants are not entitled to summary judgment on this claim.

B. NYLL § 195(3).

N.Y. Lab. Law § 195(3) requires employers to provide employees "with a statement with every payment of wages" listing various items. Liu declares that he never received such statements when he was paid. Liu Decl. ¶ 23. The defendants offer little by way of response, other than a general assertion that "the employer compensation statements confirm that defendants have complied with the labor laws." Defs.' Mem. 12. At any rate, while Benlevi testified that he would give copies of these compensation schedules to Liu, when asked whether he "would give it to him at each one of his payments," Benlevi responded, "[n]ot necessarily, but they would follow because he had the calculation that he was giving me in the notebook that he would put together and this was my verification of his information." Benlevi Dep. 94:2–12. Because conflicting evidence exists as to whether Liu received the required wage statements, summary judgment is inappropriate on this claim as well.

V. *Defendants' counterclaim.*

The defendants also seek summary judgment on their counterclaim, that Liu violated New York's "faithless employee doctrine."

Under New York law, employees are "obligated 'to be loyal to [their] employer and [are] prohibited from acting in any manner inconsistent with [their] agency or trust and [are] at all times bound to exercise the utmost good faith and loyalty in the performance of [their] duties.'" *Phansalkar*, 344 F.3d at 200 (quoting *W. Elec. Co.*, 41 N.Y.2d at 295). An employee "who is faithless in the performance of his services is generally disentitled to recover his compensation,

16

whether commissions or salary." *Id.* (quoting *Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 928 (1977)).

In determining whether an employee was sufficiently "faithless" to forfeit his compensation, New York courts have applied two different standards, each originating in late nineteenth-century decisions. *Id.* at 201. The first asks whether the "misconduct and unfaithfulness . . . substantially violates the contract of service." *Id.* (quoting *Turner v. Konwenhoven*, 100 N.Y. 115, 120 (1885)). The second asks whether the "misconduct . . . rises to the level of a breach of duty of loyalty or good faith" as a matter of agency law. *Id.* at 202 (quoting *Murray v. Beard*, 102 N.Y. 505, 508 (1886)). Notably, "New York courts have not reconciled any differences between [the two standards], or defined the circumstances, if any, in which one standard should apply rather than the other." *Id.* Here, however, the defendants' summary judgment motion must be denied.

The defendants claim that Liu acted "faithlessly" in three ways: (1) by misrepresenting the hours he actually worked by including his break time; (2) by "removing and taking" the notebook documenting his hours and compensation; and (3) by filing "false and misleading claims" with the New York DOL. Am. Answer ¶ 9; Defs.' Mem. 18. As for the first, Liu has presented evidence—through his own testimony and the notebook—that would allow a reasonable trier of fact to conclude that Benlevi agreed to compensate him for his break time. Regarding the second, taking the notebook was, at worst, a "single act and not a persistent pattern of disloyalty," insufficient to establish liability under the faithless employee doctrine. *Schwartz v. Leonard*, 526 N.Y.S.2d 506, 508 (2d Dep't 1988) (holding that lawyer's covert taking of files from employer's office "to protect his own and his clients' interest" was not disloyalty). And with respect to the third, the defendants have not presented sufficient evidence that would

compel a reasonable jury to conclude that Liu's claims before the DOL were "false and misleading." To the contrary, as explained above, Liu has put forth enough evidence for a jury to conclude that his accusations have merit. Indeed, after conducting its own investigation, the DOL actually found that Liu's claims were legitimate.

The defendants' motion for summary judgment is DENIED.

**SO ORDERED.**

Brooklyn, New York  
June 29, 2018

*Edward R. Korman*  
Edward R. Korman  
United States District Judge